**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **VALENTINA RUIZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 05 C 6098** |
| **v.** ) | **Mag. Judge Michael T. Mason** |
| ) | |
| **JOANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Valentina Ruiz ("Ruiz" or "claimant"), has brought a motion for summary

judgment seeking judicial review of the final decision of the Commissioner of Social

Security ("Commissioner"). The Commissioner denied Ruiz's claim for Disability Insurance

Benefits ("DIB") under the Social Security Act ("Act"), 42 U.S.C. §§ 216(I) and 223. The

Commissioner filed a cross-motion for summary judgment asking the court to uphold the

decision of the Administrative Law Judge. The court has jurisdiction to hear this matter

pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Ruiz's motion for

summary judgment is granted in part and denied in part, the Commissioner's cross-motion

for summary judgment is denied, and the case is remanded for further proceedings

consistent with this opinion.

**BACKGROUND**
**Procedural History**

Ruiz filed her application for DIB on July 8, 2002. (R. 140-42). In her application,

she alleged an onset date of December 28, 2001. (R. 140). Ruiz's claim was initially

denied on August 27, 2002 and was denied upon reconsideration on December 26, 2002. (R. 92-95, 102-105). On March 18, 2003, Ruiz filed her request for a hearing. (R. 109). Although Ruiz's request for a hearing was untimely, good cause was shown for the delay and the ALJ proceeded with the hearing on July 2, 2003. (R. 38-87, 106-108, 115-22). A supplemental hearing was held on October 16, 2003 in Evanston, Illinois before ALJ Cynthia Bretthauer ("ALJ"). (R. 24-37, 129-39). On April 16, 2004, the ALJ issued a written decision denying Ruiz's request for benefits. (R. 13-23). On April 28, 2004, Ruiz filed a request for review of the ALJ's decision. (R. 12). The Appeals Council denied Ruiz's request for review on August 26, 2005 at which time the ALJ's decision became the final decision of the Commissioner. (R. 6-8); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Ruiz subsequently filed this action.

**Medical Evidence**

On November 5, 2001, Ruiz saw Dr. Eugene Lopez for problems she was having with her hands and low back pain.[1] (R. 218). Dr. Lopez reported that the problem with Ruiz's hands was getting worse and was causing her to drop things. (*Id.*). Following the exam, Dr. Lopez put claimant on light duty with a five-pound maximum nonrepetitive work restriction. (*Id.*). Dr. Lopez prescribed splints for Ruiz to wear on her hands, ordered an MRI of her lumbar spine, and referred her to Dr. Bruce Montella for further evaluation and treatment. (*Id.*).

An MRI of Ruiz's lumbar spine was performed on December 22, 2001. (R. 219, 305). The MRI showed that minimal scoliosis was present and at the L3-4 and L4-5 levels,

---

[1]Prior to November 2001, Dr. Lopez had been treating claimant for numbness and tingling in her hands for over one year. (R. 218).

early degenerative changes were seen with some mild loss of normal hydration of their individual nucleus pulposis. (R. 219). Also present at the L3-4 and L4-5 levels, were posterior disc bulges or herniations indenting the ventral surfaces of the thecal sac. (*Id.*). Narrowing of the right lateral recess at the L4-5 level was also present. (*Id.*). The remaining discs appeared intact. (*Id.*).

On December 28, 2001, Dr. Montella saw Ruiz and ordered her to remain off of work until he released her. (R. 299). Ruiz saw Dr. Montella again on January 17, 2002 for back pain and radiating leg pain that she began experiencing following an on-the-job injury, while she was working at Starbucks, that occurred on October 24, 2001. (R. 220). Her pain began with an onset of back pain, followed by radiating right leg, lateral thigh and lateral calf pain. (*Id.*). Her symptoms include numbness and tingling which is persistent, daily, constant, and worsens with bending, lifting, twisting, increasing exertion and with an onset of fatigue. (*Id.*).

Dr. Montella examined Ruiz and found her to be well developed and well-nourished. (*Id.*). Dr. Montella reviewed Ruiz's MRI and noted that it revealed an L4-5 disc herniation and L3-4 disc bulges. (*Id.*). Dr. Montella also found that Ruiz's back injury in October 2001 led to a disc herniation which was the cause of her back and radiating leg pain.[2] (*Id.*). He recommended treatment including maximizing non-operative management with activity modification, anti-inflammatories and physical therapy. (R. 221, 228). Dr. Montella indicated that based on his objective assessment of Ruiz's functional capacity at the time,

---

[2]The "History" section of Dr. Montella's notes, dated January 17, 2002, states that Ruiz suffered an injury on October 24, 2001. (R. 220). Whereas the "Assessment/Plan" section states that Ruiz injured her back on October 28, 2001. (R. 221).

he believed it unreasonable for Ruiz to participate at work in any way. (R. 221, 300).

On January 21, 2002, Dr. Lopez renewed his five-pound maximum lifting restriction that he originally ordered on November 5, 2001. (R. 301). Additionally, he restricted Ruiz to non-repetitive work with varied activities and also noted that she was currently off of work at that time due to a spinal ailment as prescribed by another doctor. (*Id.*).

On January 29, 2002, Ruiz attended physical therapy at the Joyner Sports Medicine Institute ("Joyner"). (R. 229). She complained of increasing pain in her lower back and increasing pain and numbness in her right leg which was limiting her activities. (R. 230). She described her pain as throbbing spasms with numbness and tingling. (*Id.*). An objective exam revealed that Ruiz had poor sitting posture and 50 percent of normal flexion that was limited by pain. (*Id.*). She had difficulty standing, lifting, walking, and cleaning. (R. 231). She had tightness in her hamstrings and piriformis, muscle spasms in the L/S region, and was unable to tolerate extension exercises. (*Id.*). The physical therapist noted that Ruiz had good rehabilitation potential. (*Id.*).

On February 7, 2002, claimant saw Dr. Montella for difficulties that she was having with her back and radiating leg pain. (R. 222). Dr. Montella noted that Ruiz was improving with non-operative management. (*Id.*). He continued her physical therapy but found that it would be unreasonable for her to work in any way at that time. (R. 222, 228, 302).

On February 7, 8 and 12, 2002, Ruiz attended physical therapy at Joyner. (R. 229). Ruiz complained of lower back pain and right leg pain. (*Id.*). Joyner recommended further treatment to decrease her pain and increase her flexibility and strength. (R. 229, 294).

Dr. Mark N. Levin performed an independent medical examination ("IME") of claimant on February 14, 2002. (R. 244-49). At that time, Ruiz's main complaint was low

back pain, with sharp pain going into her right buttock and down her right leg. (*Id.*). She complained to Dr. Levin of numbness over her right calf and tingling in her right foot. (*Id.*). Ruiz told Dr. Levin that she felt an "electrical shock" in her low back accompanied by pain while moving tables and chairs at work on October 28, 2001 but that she continued to work until December 28, 2001. (*Id.*). She reported to Dr. Levin that she was placed on Celebrex but after no improvement was switched to Vioxx. (*Id.*). She told Dr. Levin that she was attending physical therapy at Joyner for four weeks. (*Id.*). She denied ever having any previous low back injuries. (R. 245).

Dr. Levin's physical examination revealed an obese female who weighed 216 pounds and was 66 inches tall. (*Id.*). Dr. Levin reviewed claimant's December 2001 MRI and found that it showed a central and right-sided disc protrusion that was abutting the ventral thecal sac at L3-4, but did not cause any nerve root impingement. (R. 246). Dr. Levin also noted that at L4-5 there appeared to be a right-sided disc herniation that was abutting up against the nerve and could have been causing impingement. (*Id.*). Based upon claimant's history, physical examination, radiographic studies and medical records, Dr. Levin found that Ruiz appeared to have a herniated disc at L4-5 that may have been causing her symptoms and that her history related it to a work injury even though she did not report that to Dr. Lopez at the visit on November 5, 2001. (*Id.*). Dr. Levin thought it would be appropriate for Ruiz to receive a series of two epidural steroid injections and that she did not appear to be capable of working at a standing position. (*Id.*). Dr. Levin recommended that Ruiz remain off of work while she underwent two epidural injections and should be reassessed after the second injection for a possible return to work status. (*Id.*).

On the same day, Ruiz attended another physical therapy session at Joyner during

which she reported that she stopped taking Vioxx because she thought that she was allergic to it. (R. 233). The physical therapist found that she had an increase in pain since she had stopped taking the medication. (*Id*.).

On February 19, 2002, Ruiz saw Dr. David L. Spencer for the pain in her back and right leg. (R. 256). She reported experiencing disabling right sided back pain and sciatica despite taking Celebrex, Vioxx and undergoing physical therapy. (*Id*.). Upon his examination, Dr. Spencer found claimant to be in obvious discomfort. (*Id*.). He noted that she rose to an erect position and stood with a somewhat forward thrust to her torso with increasing complaints of pain when she stood fully erect. (*Id*.). Dr. Spencer reviewed claimant's December 2001 MRI and noted that it revealed a herniated disc on the right at L4-5, which was consistent with her symptoms. (*Id*.). Dr. Spencer opined that an epidural steroid injection would probably not solve claimant's problem and that a microsdiscectomy would be the most appropriate treatment to get her the best possible recovery in the shortest possible time. (*Id*.).

On March 15, 2002, Dr. Spencer performed a right-sided L4-5 microdiscectomy procedure on Ruiz. (R. 223). Dr. Spencer's pre-operative and post-operative diagnosis of Ruiz was that she was suffering from right-sided sciatica due to an L4-5 disc herniation. (*Id*.). On March 28, 2002, Dr. Spencer reported that Ruiz was doing fine following the microdiscectomy and recommended guarded activity. (R. 255). Dr. Spencer also noted that physical therapy might be possible or light duty, but that Ruiz was unable to return to work until further notice. (*Id*.). On April 11, 2002, Dr. Spencer found that she was doing fine, initiated a course of physical therapy, and ordered Ruiz not to work until further notice. (R. 255, 307).

Ruiz attended physical therapy at Joyner on April 16, 18, 19, 23, 24, 26 and 30, 2002 following the March 2002 microdiscectomy. (R. 234). On April 16, the physical therapist's assessment indicated that Ruiz had pain and numbness in her right leg, had poor core stabilization, and had decreased balance and LE strength. (*Id.*). On April 18, Ruiz reported that she had difficulties with her exercises at home, but the physical therapist noted that Ruiz had an increased ease of exercises at therapy. (R. 236). On April 24, Ruiz reported increasing right hamstring soreness and tightness. (R. 237). On April 26, she reported that her right leg was stiff, and the physical therapist noted that she was doing well except for her right leg pain. (R. 236). On April 30, Ruiz said that she was moving a little better but her right leg still hurt. (R. 237).

On May 2, 2002, Dr. Spencer saw claimant and noted that she was doing much better and was no longer taking any pain medication. (R. 257). Dr. Spencer recommended that she continue going to therapy for another two to four weeks and was releasing her to return to work in two weeks at her regular job without any limitations. (*Id.*). A physical therapy progress report from Joyner, dated May 2, 2002, showed that Ruiz was still experiencing right leg pain when she stood or walked too much, that she was no longer complaining of numbness in her foot, but she was still experiencing pain in her right calf. (R. 238). Objective findings revealed that she had poor endurance of the abdominals, core stabilization pain, that her right hamstrings were still tight, and further strengthening, endurance, and work conditioning exercises were recommended. (*Id.*).

Ruiz attended physical therapy on May 8, 9, 10, 14, 16, 17, 2002, and reported that she was still experiencing right leg pain when standing. (R. 240-42). On May 16, Ruiz reported to the physical therapist that she had increased cracking in her back and was

complaining of right leg pain. (R. 241). On May 17, claimant reported that she was stiff and the physical therapist noted that she did not have any difficulties with lifting, but that she was fatigued. (R. 242). Ruiz continued with physical therapy sessions on May 21, 22, and 23, 2002. (R. 242-43).

On May 20, 2002, Dr. Spencer ordered Ruiz to remain off of work. (R. 308). On May 28, 2002, Ruiz told Dr. Spencer that she had gone back to work for two days and had a "flareup" of back pain and sciatica. (R. 258). Dr. Spencer found Ruiz's physical exam to be basically normal, but based on her subjective complaints, Dr. Spencer recommended that she not go back to work for two weeks and ordered a second MRI. (*Id.*).

On June 12, 2002, Ruiz underwent a second MRI of the lumbar spine. (R. 269, 316). The diagnostic report showed that there were degenerating discs at the L3-4 through L5-S1 levels. (*Id.*). On June 20, 2002, Dr. Spencer reviewed and discussed the MRI results with Ruiz. (R. 258). He recommended that she take Motrin three times daily and return to work at her regular job for half days for a two-week trial basis. (R. 258, 309). Dr. Spencer hoped that Ruiz would then be able to go back to work full time. (R. 258).

Dr. Spencer examined Ruiz again on July 11, 2002 which revealed physical findings that he thought consistent with some legitimate back pain and sciatica. (R. 259). After reviewing the MRI scans again, Dr. Spencer found that Ruiz had an L4-5 disc herniation on the right that was the source of her symptoms. (*Id.*). Dr. Spencer opined that Ruiz's continued symptoms were due to an L4-5 disc herniation and recommended a repeat microdiscectomy at L4-5. (*Id.*). He ordered Ruiz to remain off of work and prescribed Vicodin. (R. 310).

Dr. Levin saw Ruiz for a reevaluation of an IME on July 18, 2002. (R. 247-49).

Dr. Levin noted that Ruiz complained of right leg pain that went down her thigh to her mid-calf with numbness over her right foot. (*Id.*). Dr. Levin noted that Ruiz can sit, but when she gets up, her pain increases and she can stand for about 10 minutes. (*Id.*). She does not walk much and can only drive for about 20-30 minutes because of her low back pain, right leg pain, and numbness. (*Id.*). Dr. Levin performed a physical exam and reviewed Ruiz's June 2002 MRI. (R. 248). According to Dr. Levin, the MRI showed postoperative changes at L5/S1 and that there appeared to be compression of Ruiz's nerve root by a disc herniation at L4-5. (*Id.*). Dr. Levin opined that Ruiz's symptoms appeared to be related to some compression of her nerve at the L4-5 level. (*Id.*). Dr. Levin thought that it would be appropriate, from an orthopedic standpoint, for claimant to undergo surgery for a right-sided discectomy at L4-5 to try to relieve her symptoms. (*Id.*). Dr. Levin suggested another option that included epidural steroid injections, but he did not think that the epidurals would aid her because of the intervening length of time and the comparison MRI studies. (*Id.*). Dr. Levin found that at the time, claimant was not capable of returning to work and should proceed with surgical intervention. (R. 249). Dr. Levin noted that claimant should be capable of returning back to full-duty within three months of the operation. (*Id.*).

Dr. Spencer performed a repeat right-sided L4-5 microdiscectomy procedure on claimant on July 26, 2002. (R. 250). Dr. Spencer's preoperative and postoperative diagnosis was that Ruiz was suffering from right-sided sciatica due to residual L4-5 disc herniation. (*Id.*). On August 13, 2002, following her second microdiscectomy, Dr. Spencer saw claimant and found that she was doing fine following the surgery and that the wound was healing nicely. (R. 260). Dr. Spencer noted that Ruiz had no residual

sciatic pain, some back pain, and a little numbness in her right leg. (*Id.*). Dr. Spencer also noted that claimant had recently been in the Lake Geneva area for a weekend of activities and did a lot of walking, up and down the hills, which she found very fatiguing but was capable of doing it. (*Id.*). Dr. Spencer ordered Ruiz to remain off of work for four weeks. (R. 311).

On August 20, 2002, E. C. Bone, M.D., completed a residual functional capacity ("RFC") assessment. (R. 261-268). The RFC assessment showed that Ruiz could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk with normal breaks, at least two hours in an 8-hour workday; sit with normal breaks, for a total of about six hours in an 8-hour workday; could do unlimited pushing and/or pulling other than what was shown for lift or carry. (R. 262). It also showed that Ruiz could climb ramps or stairs frequently and could climb ladders, ropes or scaffolds, balance, stoop, kneel, crouch, or crawl occasionally. (R. 263). There were no manipulative limitations established. (R. 264). The RFC assessment included comments regarding the appearance of a small disc herniation at L3-4 and L4-5 in the MRI. (R. 268).

On September 12, 2002, Dr. Spencer ordered Ruiz to remain off of work for four weeks, and on October 10, 2002, Dr. Spencer ordered claimant to remain off of work for four additional weeks. (R. 311-12). On November 7, 2002, Dr. Spencer released Ruiz to work for two days per week with a 20-pound lifting restriction. (R. 313). On December 5, 2002, Dr. Spencer ordered Ruiz to continue her present work status. (R. 314).

At a physical therapy session on September 17, 2002, the physical therapist found that Ruiz had slightly improved hamstring flexibility. (R. 295). At another physical therapy session at Joyner on November 7, 2002, the physical therapist noted that Ruiz continued

to demonstrate slight improvement in flexibility, but her pain continued to limit her.  (R. 296).  On December 5, 2002, at physical therapy, Ruiz reported having difficulty at work with bending, reaching and lifting.  (R. 297).

On December 16, 2002, E.C. Bone, M.D., completed a second RFC assessment. (R. 273-280).  The second RFC assessment showed that Ruiz could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for approximately six hours in an 8-hour workday with normal breaks; sit for a total of about six hours in an 8-hour workday with normal breaks; and could do unlimited pushing or pulling other than what was shown for lift or carry.  (R. 274).  The RFC showed that Ruiz had no postural limitations except that she could never balance and no manipulative limitations were established.  (R. 275, 276).  The RFC assessment indicated that Ruiz was doing well since her surgery.  (R. 280).  There was also a comment regarding Ruiz's trip to Lake Geneva in August 2002 which stated that she "was able to do a lot of walking up and down hills which she found fatiguing, but was able to do it." (*Id*.).  The RFC assessment concluded with a comment that Ruiz was capable of work activity.  (*Id*.).

On January 4, 2003, Dr. Spencer ordered Ruiz to continue her present work status for six weeks.  (R. 312).  On January 8, 2003, Ruiz attended physical therapy complaining that her back pain and spasms had returned, that her right hamstring was worse, and that she had some pain in her lateral quads.  (R. 298).  The therapist noted that Ruiz was not progressing with therapy and therapy was discontinued at that time. (*Id*.).  On February 20, 2003, Dr. Lopez put a 5-pound maximum lifting restriction on claimant and non-repetitive work restriction for one month.  (R. 301).

On April 7, 2003, Paige Shafer, MS OTR/L performed a Functional Capacity

Evaluation ("FCE") of Ruiz.[3]  (R. 286-292).  Ruiz was referred for a job specific FCE to determine her overall physical capabilities and tolerances to return to work as a shift supervisor at Starbucks and to determine the physical barriers that may exist which prevent her from returning to work.  (R. 286).  The FCE revealed that Ruiz demonstrated the physical capabilities and tolerances to function between light and light-medium categories of work and that Ruiz's job at Starbucks fit in the light-medium and medium categories of work.  (R. 287).  However, Ruiz did not demonstrate the physical capabilities and tolerances to meet all the essential physical demands of the job.  (*Id.*).  Her deficits included: decreased lift and carry tolerances; poor standing and walking tolerances; poor stooping and kneeling tolerances; unsafe ladder ascent and descent; poor repetitive bending and twisting tolerances; poor horizontal and overhead reaching tolerances; impaired bilateral manipulation and handling tolerances.  (*Id.*).  The FCE concluded that there was a high probability that Ruiz would be unable to return to work full duty as a shift supervisor at Starbucks because of the great disparity between what Ruiz was capable of doing and what her job required, and that she should be placed in an alternate position that meets her capabilities.  (*Id.*).  In accordance with the FCE, Dr. Spencer released Ruiz to work on light to light-medium duty on April 15, 2003.  (R. 315).

On April 28, 2003, Ruiz saw Dr. Terry Light for pain in her right wrist and arm that she had been experiencing since December 2002.  (R. 319).  She had been tending to keep her thumb flexed since December, was wearing a splint at night without significant improvement, and was taking Bextra.  (*Id.*).  Dr. Light's physical examination of Ruiz

---

[3]According to the Commissioner, the ALJ did not have a copy of the FCE before she rendered her decision.

revealed tenderness over her first extensor compartments, Finkelstein maneuver was markedly positive, and there was slight tenderness over the A1 pulley of her right thumb. (R. 320). Dr. Light believed that Ruiz's symptoms were predominantly due to DeQuervain's tenosynovitis involving her right wrist and that she had a mild degree of flexor tenosynovitis or trigger thumb. (*Id.*). Dr. Light gave Ruiz a steroid injection beneath the first extensor compartment retinaculum and in the A1 pulley region of her right thumb and scheduled a follow-up exam. (*Id.*).

On June 5, 2003, claimant saw Dr. Light for persistent pain and radiating discomfort that she was experiencing in her hand. (R. 321). After examining Ruiz, Dr. Light believed that Ruiz's symptoms were predominantly related to trigger thumb rather than to DeQuervain's. (*Id.*). Dr. Light informed Ruiz that she may require surgical treatment. (*Id.*). He restricted her from doing work activity that included heavy lifting or required a lot of pinching with her thumb but noted that Ruiz could do a wide range of activities. (*Id.*).

On June 18, 2003, Dr. Spencer completed a Lumbar Spine RFC questionnaire on behalf of claimant. (R. 281-284). Dr. Spencer diagnosed Ruiz with back pain and sciatica status post microdiscectomy surgery on March 15, 2002 and July 26, 2002. (R. 281). Dr. Spencer's prognosis was that Ruiz was stable with chronic back pain related to chronic activity. (*Id.*). Dr. Spencer noted that Ruiz experiences back pain that radiates intermittently into both legs and is aggravated by bending, twisting and prolonged standing. (*Id.*). Dr. Spencer also noted that Ruiz's impairments were reasonably consistent with her symptoms and functional limitations and that Ruiz occasionally experiences pain or other symptoms severe enough to interfere with attention and concentration that is needed to perform even simple work. (R. 282).

Dr. Spencer noted that claimant could walk six city blocks without rest or severe pain and that she could sit for more than two hours before needing to get up; that she could stand for one hour at a time; and that she could stand or walk for at least six hours in an eight-hour work day with normal breaks. (R. 282, 283). Dr. Spencer noted that Ruiz needs periods of walking around during an 8-hour work day approximately every ten minutes for at least ten minutes, but that she does not need a job that permits shifting positions at will from sitting, standing, or walking. (R. 283). Dr. Spencer noted that Ruiz would sometimes need to take unscheduled breaks during an eight-hour work day for five minutes for an indefinite period throughout an eight-hour day. (*Id.*). In a competitive work situation, Ruiz could frequently lift and carry ten pounds; occasionally lift and carry twenty pounds and never lift or carry fifty pounds. (*Id.*). Dr. Spencer noted that Ruiz could rarely stoop or crouch; occasionally twist or climb ladders and could frequently climb stairs. (R. 284). Dr. Spencer noted that Ruiz did not have significant limitations in doing repetitive reaching and that she had 100% ability to grasp, turn objects with both of her hands; 100% ability to do fine manipulations with all of her fingers; and 100% ability to reach, including overhead, with her arms. (*Id.*). Dr. Spencer noted that Ruiz would likely be absent for more than four days per month. (*Id.*).

On July 1, 2003, Dr. Light completed a Manipulative Limitations RFC questionnaire on Ruiz's behalf. (R. 317-18). He noted that Ruiz exhibits symptoms of tenderness and pain that affect her wrists, hands or fingers. (*Id.*). Dr. Light indicated that Ruiz has significant limitations in doing repetitive reaching, handling and fingering. (*Id.*). Dr. Light crossed out the section of the questionnaire where he could have indicated the percentage of time during an eight-hour day on a competitive job that claimant could use her hands,

fingers and arms and instead noted in that section that claimant will have pain with right-hand lifting and twisting. (*Id.*).

On July 17, 2003, Ruiz reported to Dr. Light that she felt better for a few days after the injection of her A1 pulley of her right thumb. (R. 323). Dr. Light believed that there would be benefit in surgical release of the A1 pulley and that she would need to begin vigorous therapy if she was to gain effective function in her right thumb. (*Id.*). Dr. Light believed that maximal medical improvement was likely to occur within three months but that Ruiz was likely to still have some symptoms in her forearm following the surgery on her thumb. (*Id.*).

**Claimant's Testimony**
**Testimony from the July 2, 2003 Hearing**

Ruiz lives with her husband and three children in an apartment in Arlington Heights, Illinois. (R. 44). She completed high school and is right-handed (R. 45, 52). Ruiz testified that she worked at Starbucks as a shift supervisor until she was injured. (R. 45). Ruiz has also worked as a package handler and as a nursing placement/staff coordinator. (R. 46).

Ruiz testified that Dr. Spencer performed two surgeries on her. (R. 47). After the first back surgery, some of her pain was alleviated, but she re-injured her back during a work-hardening program. (R. 71). After the second surgery, her back felt a little better, but she still has chronic sciatica in her legs and can hardly lift them when they become inflamed. (*Id.*). Ruiz testified that she limps because she experiences sciatic pain on a daily basis. (*Id.*). Ruiz also stated that she has spasms, on a daily basis, mostly in the back of her right thigh. (R. 72).

Ruiz stated that the last time that she saw Dr. Spencer was a couple of weeks

before the hearing.  (R. 47).  At that time, Dr. Spencer performed an examination and told

her that there had been no improvement in her condition.  (R. 48).  Ruiz attended physical

therapy three times a week, as recommended by Dr. Spencer, but it did not help her.  (R.

48-50).  Ruiz testified that Dr. Spencer has not recommended more therapy because of the

risk of further injury to her back and that Dr. Spencer told her that this was as good as she

was going to get.  (R. 70).

After her injury, Ruiz returned to work at Starbucks a few times but was never able

to finish a shift because she would experience pain and was unable to move after working

for a couple of hours.  (R. 46-47).  Ruiz also testified that she could not work as a package

handler or as a nursing placement/staff coordinator now because telephone work and

writing would conflict with her right hand.  (R. 46).  Ruiz testified that she cannot work in

positions that require repetitive movements with her hands, she cannot lift over 5 pounds,

she can occasionally carry about 10 pounds, and she is limited on bending, stooping,

crouching down and twisting.[4]  (R. 47, 61, 62).  Ruiz testified that the lifting restrictions were

on her hands and not her back.  (R. 63).

Ruiz testified that she takes medications for sciatica that she has in both legs.[5]  (R.

49).  Ruiz also testified that she takes Darvocet which she only takes at nighttime because

it makes her drowsy.  (R. 54).  According to Ruiz, the worst pain that she experiences is

in her lower back and both legs.  (R. 53).  She takes medication and ices her legs in order

to relieve pain.  (*Id.*).  She experiences constant, mild pain in both legs that increases as

---

[4]Ruiz also testified that she can lift about 10 pounds.  (R. 54).

[5]Based upon Ruiz's testimony, Ruiz's attorney gave the ALJ a medications list.  (R. 49).
However, the ALJ did not read the list into the record.  (*Id.*).

she begins to exert herself or works.  (*Id.*).  She also has pain in her right hand all of the time, which travels up her arm to her elbow, and her wrist swells.  (R. 53-54, 62).

Ruiz testified that at the time that she returned to work at Starbucks after her injury, she injured her right hand while working the bar.  (R. 51).  Ruiz sees Dr. Terry Light for pain that she had been experiencing in her hands.  (R. 51).  She was referred to Dr. Light by Dr. Lopez, who she had been seeing for pain in her hands since 1999.  (R. 52, 57).  Dr. Lopez had thought that Ruiz was suffering from carpal tunnel syndrome and had prescribed wrist splints for her to wear at night.  (R. 52).  The splints help with her tendonitis by keeping her wrists in place.  (R. 52).  The right splint has a thumb portion included on it.  (R. 62).  Dr. Lopez also prescribed Celebrex and Vioxx, but she stopped taking them since the pain was still bad.  (R. 57).

Dr. Light diagnosed Ruiz with severe tendonitis and DeQuervains and trigger finger from the inflamation.  (R. 51).  Dr. Light prescribed anti-inflammatories and has given her two cortisone injections which did not help her.  (R. 51-52).  At the time of the hearing, she had a future appointment scheduled with Dr. Light at which time he was going to determine whether she needed surgery.  (R. 52).  An EMG was performed on her hands, and it was negative.  (R. 58).

Ruiz's daily routine involves waking up; getting her children ready for the day; she rarely cooks breakfast, and if she does, her oldest son helps her because she cannot grasp well.  (R. 55).  Her children dress themselves, prepare their own breakfast, help with the laundry, the cooking and the cleaning.  (R. 55, 56, 69, 73).  Ruiz's husband or one of her children accompany her to go grocery shopping because she cannot do it alone.  (R. 56, 68).  She prepares meals, and her husband helps her cook them.  (R. 56).  Ruiz's husband

has had to do more around the house since she was injured; he cleans the bathrooms and Ruiz helps her daughter load the dishwasher. (R. 56, 76-77). Ruiz tries to do core strengthening exercises and some walking. (*Id.*). Since the injury to her back, she no longer paints or rides bikes. (R. 57). She goes out to eat and goes to the movies. (R. 58). She is always in pain, even on a good day, and any daily activity may cause her pain to increase. (R. 66-68). On good days, she tries to do a little bit more, but that usually causes her problems the next day. (R. 68). Sometimes she sleeps and sometimes she is awakened by pain. (R. 69).

**Testimony at the October 16, 2003 Supplemental Hearing**

At the initial hearing, the ALJ asked Ruiz's attorney to obtain numerous records that were not previously submitted to the ALJ. (R. 28, 86). At that time, the ALJ stated that she would keep the record open for three weeks in order to receive those documents. (*Id.*). At the supplemental hearing, the ALJ allowed Ruiz's attorney to ask questions about the updated materials. (R. 29).

On August 14, 2003, Dr. Light performed surgery on Ruiz's right thumb. (R. 31). Ruiz is now able to extend her thumb, but it returns to a bent position. (*Id.*). Dr. Light informed Ruiz that this was because of scar tissue that had formed and perhaps it would get better over time. (R. 31, 32). Ruiz's thumb is hurting more now because of the swelling and scar tissue that has formed as a result of the surgery. (R. 32). Ruiz also testified that her physical therapy was discontinued. (*Id.*).

With respect to her back, Ruiz testified that Dr. Spencer told her that her back is as good as it is going to get because she has problems with other discs in her back. (R. 33). Her physical condition and restrictions were the same at the time of the supplemental

hearing as they were at the initial hearing.  (*Id.*).

**Vocational Expert Testimony**
**Testimony from VE James Radke from the July 2, 2003 Hearing**

VE Radke described Ruiz's past work as a supervisor as light and skilled; her past work as a package handler as medium and unskilled; and her past work as a nursing placement staff coordinator, although not listed in the Dictionary of Occupational Titles ("DOT"), as a sedentary and semiskilled position.[6]  (R. 78).

The ALJ asked VE Radke whether the following hypothetical person could work: a person of the same age with the same education and work experience as the claimant, who could sit for six to eight hours out of the day; stand and walk at least six hours out of the day; could lift and carry frequently up to ten pounds, occasionally up to twenty pounds; could never climb any ladders, ropes, and scaffolds.  (R. 79).  VE Radke testified that this individual could perform the staff coordinator job and the supervisor job as it is usually performed.  (*Id.*).

The ALJ then asked VE Radke to further assume that the hypothetical person could not do any repetitive grasping with the right hand but could do frequent grasping.  (*Id.*).  VE Radke testified that the person could not do the supervisor job but could perform the nursing staffing coordinator job.  (*Id.*).  VE Radke further testified that in the nine-county northeastern Illinois area, there are other positions that the hypothetical individual could

---

[6]In her decision, the ALJ mistakenly names VE Cheryl Hoiseth–the VE who testified at the October 16, 2003 supplemental hearing–as the VE who testified as to Ruiz's past relevant work.  However, it was VE Radke who proffered such testimony.  VE Radke noted that although there is no comparable job in the DOT that matches the nursing placement/staff coordinator position, it can be compared to similar positions of a clerical nature that have an SVP usually in the 3 to 4 area which is a semi-skilled position. (R. 84).

perform, including: 23,400 cashier positions; 3,600 transportation ticket and reservation clerk positions; 2,300 order clerk positions; and 2,100 library clerk positions.  (R. 79-80).  All of those jobs would still be available if a limitation of no repetitive fine manipulations with the right hand was added.  (R. 80).

The ALJ then referred VE Radke to Dr. Spencer's assessment of Ruiz's limitations and restrictions.  (*Id.*).  The ALJ changed Dr. Spencer's assessment from stoop rarely to occasionally and she took out the provision that the claimant would miss work more than four days per month.  (*Id.*).  Then she asked the VE to consider the rest of Dr. Spencer's limitations and restrictions and asked whether such a person could perform Ruiz's past relevant work.  (*Id.*).  VE Radke opined that such a person could not perform the package handler position, could not perform the supervisor position, but could perform the nursing placement position.  (*Id.*).  VE Radke also opined that such a person could also perform the additional jobs: cashier, transportation ticket and reservation clerk, order clerk and library clerk positions.  (*Id.*).

The ALJ asked VE Radke whether missing more than four days per month would preclude employment and VE Radke testified that it would.  (R. 81).  VE Radke also testified that if a person had to walk for ten minutes, every ten minutes, this would not have an impact on the cashier position; would bring down the order clerk positions to 2,000 positions; would have no impact on the library clerk positions; would reduce the transportation and ticket clerk positions to 1,000; and would have no impact on the nursing placement/staffing coordinator position.  (R. 82-83).  VE Radke testified that if a person needed to take a five minute break every fifteen minutes for an indefinite amount of time, that person would be unemployable.  (R. 83).  VE Radke further testified that the nursing

placement position would allow for unscheduled breaks and that the person could probably "get away with it" in the library position but unscheduled breaks are not tolerated in the remaining jobs he indicated. (*Id.*).

Finally, VE Radke testified that if the hypothetical person has the same restrictions in the RFC filled out by Dr. Spencer, including removing the person's necessity to take more than four days off per month as well as the stooping requirement to occasionally, but could not lift more than five pounds and could not carry more than ten pounds on an occasional basis, VE Radke testified that the person would be at less than a full-range of sedentary and that is impossible for a VE to quantify. (R. 85-86).

**Testimony from VE Cheryl Hoiseth at the Supplemental Hearing**

At the Supplemental Hearing on October 16, 2003, the ALJ did not further question the VE. Rather, Ruiz's attorney asked VE Hoiseth specific questions regarding cashier positions, order clerk positions and library clerk positions. (R. 34).

The VE testified that a light-level, unskilled cashier would have to stay on task and would be allowed three scheduled breaks: morning, lunchtime and afternoon. (R. 34). The VE testified that whether an employer would allow an employee to take three breaks at unscheduled times depends on the amount of time lost from being on task. (R. 35). The VE testified that missing two days of work per month is acceptable and that missing more than three days per month would preclude employment. (*Id.*). In addition, a cashier position would require the ability to pinch on more than an occasional basis in order to pick up coins and paper money and that there is an option for sitting or standing with this position. (R. 35-36).

VE Hoiseth testified that a light-level, unskilled library clerk and a light-level,

unskilled order clerk positions are subject to the same restrictions for unscheduled breaks and days off as the cashier position. (R. 36-37). The VE further testified that an order clerk would only require occasional pinching and that a library clerk position would require frequent and constant gross, bi-manual manipulation. (R. 36-37).

## LEGAL ANALYSIS
### I. Standard of Review

We must affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401). We must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Clifford*, 227 F.3d at 869. The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### II. Analysis under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits depends on

whether the claimant is "disabled" under the Social Security Act.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy.  *Dixon*, 270 F.3d at 1176.

The claimant has the burden of establishing a disability at steps one through four.  *Zurawski*, 245 F.3d at 885-886.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Zurawski*, 245 F.3d at 886.

The ALJ followed this five-step analysis.  At step one, the ALJ found that Ruiz is not currently engaged in substantial gainful activity and has not engaged in any substantial gainful activity since the alleged onset date of December 28, 2001.  (R. 17, 20).  At step two, the ALJ found that Ruiz's impairments are severe because they have a significant impact on her physical work-related capacity.  (R. 20).  At step three, the ALJ determined that although Ruiz has severe impairments, she did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4 ("Listings").  (R. 22).  At step four, the ALJ determined that Ruiz had the

capability of returning to her past relevant job as a nursing placement/staffing coordinator as the job is generally performed in the national economy. (R. 21). The ALJ, relying on the testimony of VE Radke, determined at step five that Ruiz could perform a significant number of jobs, at a light level of exertion, including positions such as a cashier, transportation clerk, order clerk and library clerk. (R. 20, 21).

Ruiz argues: (1) that the ALJ erred when formulating Ruiz's RFC; (2) that the ALJ erred at steps 4 and 5 of the inquiry as her findings were not supported by substantial evidence; (3) that the ALJ failed to consider Ruiz's alleged obesity at any step of her analysis; and (4) that the ALJ's credibility assessment was improper as she failed to follow the requirements of SSR 96-7p.

### III. The ALJ failed to explain her RFC determination.

The ALJ found that Ruiz has the RFC to perform the physical and nonexertional requirements of a limited range of light exertional work with the following particular limitations: can frequently lift ten pounds; can occasionally lift up to twenty pounds; cannot use ladders, ropes, or scaffolds on a job; can sit for six to eight hours during an eight-hour day; can stand for six hours or more during an eight-hour day; and can do no repetitive grasping. (R. 22).

An ALJ must articulate, at some minimum level, her analysis of the evidence to allow us to trace the path of her reasoning and may not select and discuss only that evidence which favors her ultimate conclusion. *Diaz*, 55 F.3d at 307. The ALJ "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

After reviewing the record and the ALJ's decision, ALJ Bretthauer failed to build an

accurate and logical bridge to support her RFC determination. The record contains four RFC determinations. Dr. E.C. Bone, presumably a state agency doctor, prepared two RFC assessments dated August 20, 2002 and December 16, 2002. (R. 261-68, 273-80). Dr. Spencer completed a Lumbar Spine RFC assessment on June 18, 2003. (R. 281-284). Finally, Dr. Light prepared a Manipulative Limitations RFC questionnaire on July 1, 2003.[7] (R. 317-18). The ALJ discredited Dr. Spencer's RFC determination. (R. 21). However, the ALJ ignored Dr. Light's RFC and did not even acknowledge Dr. Bone's RFC assessments. ALJ's decision contains no analysis or discussion explaining how she arrived at the RFC. Even if there is enough evidence in the record to support the ALJ's ultimate RFC determination, the ALJ committed significant logical and legal errors in reaching her RFC determination due to her lack of analysis. *See Sarchet*, 78 F.3d at 307 ("[W]e cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Accordingly, this case must be reversed and remanded.[8] Upon remand, the ALJ must explain and provide reasons for her RFC determination.

## IV. The ALJ erred in her Step 4 Analysis.

If the claimant does not have a conclusively disabling impairment, as ALJ Bretthauer found here, then the ALJ must determine whether the claimant retains the RFC to perform

---

[7]Ruiz also testified about her RFC limitations. (R. 47).

[8]Ruiz argues that the ALJ erred in her RFC determination because the ALJ gave improper weight to her treating physicians. Because we cannot follow the path of the ALJ's reasoning, we are declining to address Ruiz's argument.

the physical and mental demands of the kind of work that the claimant has done in the past. SSR 82-61. To determine whether a claimant is physically capable of returning to her former work, the ALJ must ascertain the demands of that work in relation to the claimant's present physical capacities. *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984); 20 C.F.R. §404.1520(e).

In this case, the ALJ erred in finding that Ruiz is able to perform her past relevant work as a nursing/staffing coordinator because she failed to inquire into the demands of that position. *See Smith*, 388 F.3d at 252; *Strittmatter*, 729 F.2d 507 (an ALJ should have considered whether the claimant could perform the duties of the specific jobs that she previously held, not whether she could perform some type of sedentary work). This was a necessary step in this portion of the ALJ's analysis because the ALJ found that Ruiz has the capacity for returning to "her past relevant job as a nursing placement/staffing coordinator, as that job is generally performed in the national economy." (R. 21, 78).

Ruiz did testify that her prior position as a nursing placement/staffing coordinator no longer exists. (R. 46). VE Radke testified that no DOT listing exists for the position and no similar position was listed in the DOT with regard to the position. (R. 78, 83-84). VE Radke also testified that he would describe the position as a sedentary semi-skilled position even though Ruiz did not testify about the specific job duties. (R. 78). Yet, the ALJ did not elicit testimony from Ruiz regarding her specific job duties as a nursing placement/staffing coordinator.[9] Because the ALJ erred in finding that Ruiz is able to perform her past relevant work as a nursing/staffing coordinator, without inquiring into the demands of that

---

[9]Ruiz did testify that her prior position was mostly phone work and a lot of writing. (R. 46). However, the ALJ did not probe further into the specific requirements of the job.

position, remand is warranted.  On remand, the ALJ must make a proper inquiry into Ruiz's capability of performing the specific job duties of her past relevant work.

## V.  We decline to address the ALJ's Step 5 Analysis.

Because remand is necessary for further consideration of Ruiz's RFC, we need not address Ruiz's argument that the ALJ's finding at step five is not supported by substantial evidence.  *Herron v. Barnhart*, 2003 U.S. Dist. LEXIS 15176, *36 (N.D. Ill. 2003); *Gilkey v. Barnhart*, 417 F.Supp.2d 949, 965 (N.D. Ill. 2006).

## VI.  The ALJ's failure to consider Ruiz's alleged obesity was harmless error.

When the evidence in a case does not include a diagnosis of obesity, but does include clinical notes or other medical records showing consistently high body weight or BMI, the ALJ may ask a medical source to clarify whether the individual has obesity. However, in most cases the ALJ will use her judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity.  SSR 02-1p.  Where a claimant does not specifically claim obesity as an ailment, "the references to [her] weight in [her] medical records [are] likely sufficient to alert the ALJ to the impairment."  *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

In this case, it is harmless error that the ALJ did not explicitly address Ruiz's obesity. No physician ever suggested, either implicitly or explicitly, that Ruiz's obesity was exacerbating her physical impairments.  *Prochaska v. Barnhart*, 454 F.3d 731, 736-737 (7th Cir. 2006) (failure to explicitly consider the effects of obesity may be harmless error where the ALJ implicitly considers the doctors' reports who were aware of the claimant's condition).  Moreover, Ruiz has not pointed to any other evidence suggesting that her

obesity exacerbated her physical impairments. Nor has Ruiz specified how her obesity further impaired her ability to work.

Ruiz argues that Dr. Spencer did not mention her obesity in the Lumbar RFC that he was asked to complete because Dr. Spencer was not specifically asked any questions regarding her obesity. This argument is without merit. Ruiz was a patient of Dr. Spencer for over one year at the time of the hearing on this matter. He performed two microdiscectomy surgeries on her and also restricted her from returning to work on several occasions. (R. 223, 224, 227, 250, 255, 257, 258, 307, 308, 310, 311, 312). The RFC that Dr. Spencer completed includes a section that provided him with an option to attach additional pages describing the patient's limitations. (R. 284). Dr. Spencer elected not to include any further description of the claimant's limitations even though he had the opportunity to do so. (R. 284). Dr. Spencer never mentioned obesity as a factor of the claimant's condition in any of the medical records that he completed during the course of treating the claimant.

The ALJ was allowed to rely on Ruiz's treating physicians' considerations. *Prochaska*, 454 F.3d at 736-737. In this case, none of Ruiz's treating physicians ever mentioned her obesity as a contributing factor to her pain. Consequently, the ALJ's failure to specifically address claimant's obesity was harmless error.

## VI. The ALJ's Credibility Determination Fails to Comply with SSR 96-7p.

Finally, Ruiz contends that the ALJ erred in her credibility determination. This Court agrees. An ALJ must comply with the requirements of Social Security Ruling 96-7p in evaluating the credibility of statements supporting a Social Security application. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Under SSR 96-7p, an ALJ must articulate

the reasons behind credibility evaluations:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." ... The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Here, the ALJ outlined portions of Ruiz's allegations and her testimony. (R. 17). In the rationale section of her opinion, the ALJ found that "the medical record and Ruiz's regular activities establish that she is not credible." (R. 20). Clearly, the ALJ rejected some of Ruiz's allegations of disabling symptoms and limitations, but ALJ Bretthauer failed to articulate which statements she rejected or why she found Ruiz's allegations to lack credibility. In other words, the ALJ failed to specify the weight she gave to Ruiz's statements and the reasons for that weight.

In addition, when determining the extent to which Ruiz's symptoms limit her ability to do basic work activities, the ALJ failed to evaluate the intensity, persistence, and limiting effects of Ruiz's symptoms under SSR 96-7p. The ALJ failed to address Ruiz's daily activities, the location, duration, frequency, and intensity of her pain, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication that Ruiz takes or has taken to alleviate pain or other symptoms, treatment that Ruiz receives or has received for relief of pain or other symptoms, and any other factors, if any, concerning Ruiz's functional limitations and restrictions due to pain or other

symptoms.[10]

For instance, the ALJ found "that the medical record does not support Ruiz's complaints of debilitating pain." However, the ALJ ignored Ruiz's testimony that: she takes Darvocet, a pain medication; that Dr. Spencer diagnosed Ruiz with back pain and sciatica; that Dr. Spencer's prognosis was stable with chronic pain; that Ruiz regularly attended extensive physical therapy treatment sessions; and that Ruiz testified that she stopped going to physical therapy because Dr. Spencer told Ruiz that it would not help her anymore. (R. 70, 281). Finally, the ALJ ignored Ruiz's testimony that she experiences pain in her right thumb. (R. 32).

For the reasons stated above, the ALJ failed to comply with the requirements of SSR 96-7p, and the ALJ's credibility determination cannot stand. *See Brindisi*, 315 F.3d at 788. On remand, the ALJ must clearly explain her credibility finding and set forth specific reasons for that finding in accordance with SSR 96-7p.

---

[10]The ALJ noted that Ruiz drives her children to school on a daily basis and that Ruiz took a trip to Lake Geneva. However, the ALJ cannot equate an activity that does not consume a major part of Ruiz's day with the ability to work a regular eight-hour work day. *See Carradine v. Barnhart*, 360 F. 3d 751, 755 (7th Cir. 2004) (finding that an ALJ errs in a credibility determination when she failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week). Moreover, Ruiz testified that she cannot cook, clean, or shop without the help of her husband or children. (R. 54). Yet the ALJ did not address this testimony in her credibility determination.

**CONCLUSION**

For the reasons set forth above, Ruiz's motion for summary judgment is granted in part and denied in part. The Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: October 30, 2007**